IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

TOMMIE L. McCLYDE, JR.,                    §
                                           §
          *Plaintiff,*                     §
                                           §
v.                                         §          Civil Action No. H-07-4244
                                           §
DANNY JACKSON, *et al.,*                   §
                                           §
          *Defendants.*                    §

**MEMORANDUM OPINION AND ORDER**

Plaintiff, a state inmate proceeding *pro se* and *in forma pauperis*, filed this section 1983 lawsuit complaining of civil rights violations.  Defendants filed a motion for summary judgment (Docket Entry No. 37), to which plaintiff has responded.  (Docket Entry No. 57.)

Based on consideration of the motion, the response, the record, and the applicable law, the Court **GRANTS** the motion for summary judgment and **DISMISSES** this lawsuit for the reasons that follow.

**I.  FACTUAL BACKGROUND AND CLAIMS**

The record shows that, on September 18, 2007, plaintiff was a pretrial detainee in custody of the Chambers County Jail, awaiting trial on charges of engaging in organized crime and evading arrest.  (Docket Entry No. 37, Affidavit of Larry D. Cook; Docket Entry No. 8, p. 7.)  During that evening, Sergeant Danny Jackson, shift supervisor, was alerted that a toilet brush, given to the D-Tank inmates for cleaning purposes earlier that day, was missing.  Concerned that the brush could be used as a weapon, Jackson moved the D-Tank

inmates, which included plaintiff, into the dayroom and began searching their cells.

According to Jackson,

> As I was searching one of the cells, I found a bunch of copper wire hanging from the ceiling, which was being used as an antenna to improve reception on a radio/headset.  Because the wire was contraband material, I pulled it down.  As I was doing so, [plaintiff] started calling me out from the dayroom, yelling and cursing at me.  He was complaining that I was always 'fucking with their stuff.'  I told him that I did not want to hear it, and [plaintiff] started cursing again.  I told him that, if he was going to do anything about it, he should shut up.

> I did not find the toilet brush in the cells, so I headed to the dayroom to continue my search.  All of the inmates, including [plaintiff], were sitting around the dayroom table.  As I entered the dayroom, [plaintiff] stood up from the table, continuing to incite a disturbance by loud and defiant language.  He came toward me and when we met up, he bumped me with his chest.  At about that time, all of the other inmates got up and circled around us.

> [Plaintiff] had a history of creating disturbances and engaging in assaultive behavior in the jail, and I believed his actions and language to be threatening and an attempt to incite the other inmates.  I was concerned for my personal safety and for the preservation of order and discipline in the jail.  I believed that, in order to defuse the situation, I needed to immediately establish some control, and to get [plaintiff] to back down.

> I shoved [plaintiff] backwards, to put some distance between us, and told him not to get up on me.  He took a swing at me, and caught me on the right side of my chin with his fist.  I grabbed [him] to restrain him and I pushed him toward the dayroom table, trying to bend him over the table to get control.  [Plaintiff] kept fighting and resisting and tried to hit me again.  I then punched him in the nose and tried to take him to ground.

> During the foregoing, Jailer Lopez had been at the entrance to the tank, and called out for help.  [Corporal] Gabriel Davila came to assist me and, together, we managed to get [plaintiff] flipped over and got him face down on the table.  [Davila] restrained [plaintiff] with handcuffs.  Neither I nor anyone else struck or applied force to [plaintiff] after he was handcuffed.  [Davila] and I took

[plaintiff] by the arms and escorted him to Holdover 6, to separate him from the other inmates and allow the situation to cool down.

(Docket Entry No. 37, Affidavit of Danny Jackson.)  In his affidavit in support of the motion

for summary judgment, Officer Davila testified as follows:

On the evening of September 18, 2007, I was working at the Chambers County Jail.  At that time, I was in the booking office of the jail, when I heard loud voices coming from the direction of D-Tank.  I proceeded in the direction toward the noise and found jailer Claudia Lopez at the door leading into the tank.  I entered through the door and saw Sgt. Danny Jackson with [plaintiff] involved in a physical altercation, with each of them having his arms around the other.  I heard Sgt. Jackson telling [plaintiff] to stop fighting, but [plaintiff] continued to struggle with Sgt. Jackson.  [Plaintiff] would not release his grasp and Sgt. Jackson and I had to physically separate [plaintiff] from Sgt. Jackson. I grabbed one of plaintiff's arms and then Sgt. Jackson and I managed to get handcuffs on him.  No force was used on [plaintiff], once we got him handcuffed.  He was not shoved or grabbed by the throat.  We then took [plaintiff] to [holdover] and placed him in that cell so that he could settle down.

*Id.*, Affidavit of Gabriel Davila.  Officer Claudia Lopez recounted the incident as follows:

I was employed by the Chambers County Sheriff's Department as a Texas certified jailer from January 2005 through November 2008.  On September 18, 2007, I was working on the night shift at the Chambers County Jail.  That evening, I had taken cleaning supplies into D-Tank for the inmates to clean up and later returned to pick up those supplies.  I discovered that a toilet brush was missing and I told my shift supervisor, Sgt. Danny Jackson[,] of that fact. Sgt. Jackson then went into D-Tank to look for the missing toilet brush, while I remained outside, securing the door.

While Sgt. Jackson was searching one of the cells, he found some copper wire hanging down from the ceiling, that someone was using as an antenna.  After he pulled it down, I heard [plaintiff] call out to Sgt. Jackson in a belligerent manner about messing with their stuff.  I then saw Sgt. Jackson go into the dayroom, where all of the inmates from that tank were gathered around the table.

3

All of the inmates had been sitting around the dayroom table.  When Sgt. Jackson entered the dayroom, [plaintiff] stood up in a hostile manner and continued mouthing off to the sergeant, trying to provoke a confrontation.  The next thing that I saw was Sgt. Jackson and [plaintiff] struggling or wrestling, and all of the other inmates got up and circled around them.

I think I yelled out for help, and then opened the door and stepped through the doorway.  About that time, [Corporal] Gabe Davila came rushing in and grabbed my shirt to pull me aside, because I was blocking the doorway.  Cpl. Davila told the other inmates to back up and he then grabbed [plaintiff] to separate him from Sgt. Jackson.  [They] then handcuffed [plaintiff] and took him out of the tank to a holdover cell.

*Id.*, Affidavit of Claudia Lopez.

Officer Larry Cook, jail administrator of the Chambers County Jail, investigated the

incident.  He testified in his affidavit as follows:

I spoke with [plaintiff] about this incident on either September 19 or 20.  I am not sure which day.  I asked [him] to give me his version of what happened.  At first, [plaintiff] said that Jackson had come into the tank addressing him in a loud and disrespectful manner and portrayed the incident as an unprovoked assault on him by Jackson.  [He] said that Jackson had said something like, 'what you bitches and hoes doing in here.'

I then asked [plaintiff] several questions about the incident, in varying forms, which [he] answered in somewhat different fashion each time.  I asked [plaintiff] if Jackson had addressed [him] individually when he allegedly made the statement about 'bitches and hoes,' and [he] said 'no,' but that he was tired of Jackson talking to people like that.  [Plaintiff] said that he wasn't going to let Jackson talk to him like that.  I again asked [plaintiff] if Jackson had addressed him directly, and again he said, 'no.'  After further questioning, [plaintiff] admitted to me that he should have handled things differently, that [his] own words most likely provoked the entire incident, and that he was wrong for trying to provoke Jackson.  [Plaintiff] also told me he had a chip on his shoulder about Jackson, as did another inmate, LeAndrew Bradley.

[Plaintiff] said nothing to me about his having sustained any injuries as a result of the incident, nor did he complain that he had requested or been denied any

medical care.  I informed Sheriff LaRive of the incident, but took no further action, because it appeared that no further action was required at that time.

A few days later, Juanell Guidry, who served as the Jail Grievance Officer, came to me and told me that she had received a grievance from [plaintiff] regarding the incident with Sgt. Jackson.  I instructed her to make an investigation of [plaintiff's] grievance and to then report back to me.

*   *   *   *

After receiving Guidry's report, I reviewed the materials that she submitted and personally interviewed inmates Bradley, Kron, Green and Holloway. Holloway told me only that he did not want to be involved.  Bradley, Kron and Green repeated what they had put down in their written statements.  After speaking with them, it was my opinion that [their] accounts of the incident were rehearsed and contrived.  I also spoke with another inmate, Timothy Trahan, who told me that [plaintiff] was always talking about setting Jackson up and that [plaintiff] had bragged, after the incident on September 18, about how he now 'had' Jackson, and that he [plaintiff] had recruited Kron and Green to help him out in 'getting' Jackson.  Trahan also told me that Bradley had a vendetta against Jackson, because Jackson had taken contraband from Bradley at an earlier time.  It appeared to me that there had been collusion among the inmates regarding not only the grievance, but also the entire incident.

*Id.*, Affidavit of Larry D. Cook.

Plaintiff's account of the incident is not materially dissimilar.  In his complaint, more definite statement, and response to the summary judgment motion, he asserts that Officer Jackson entered the dayroom to conduct a search, and that as Jackson was leaving, he (plaintiff) called out to Jackson, "Why when you always come in here you always f\*\*king with people?"  (Docket Entries No. 1, original deletions; No. 37, Plaintiff's Grievance.) Plaintiff states that, in response to the comment, Jackson returned to the dayroom, whereupon he and Jackson had a "verbal exchange."  Plaintiff claims that Jackson then used his chest

5

to push plaintiff, plaintiff shoved him back, and they "started wrestling." (Docket Entries No. 1, p. 5; No. 8, p. 9.) He further agrees that, after he pushed Jackson, Jackson "grabbed my clothing and struggled for control, while he attempted to throw me against the dayroom table. I then grabbed a hold of Officer Jackson's shirt, making it difficult for him to throw me." (Docket Entry No. 8, p. 5.)

Plaintiff states that the second officer ran in to assist Jackson, and that, when the second officer grabbed plaintiff's hands, Jackson struck plaintiff in the nose, causing it to bleed. (Docket Entry No. 37, Plaintiff's Grievance, p. 2.) Plaintiff states that he was then handcuffed and moved to a holdover cell. Throughout his pleadings, plaintiff admits to using profanity against Officer Jackson, pushing him, wrestling with him, grabbing his shirt to prevent Jackson's subduing him, and continuing to fight back until a second officer was called in, whereupon Jackson struck plaintiff's nose and plaintiff was finally subdued through the efforts of both officers.

Plaintiff here complains that Jackson's use of force was "unnecessary" and "unprovoked," and that as a result of Jackson's physical attack, he sustained "a bused (sic) blood vessel in my nostril" and "an scared (sic) left shoulder and an bused (sic) and scared (sic) right knee." He further complains that, although his need for immediate medical treatment was "obvious" because of his nosebleed, he was not provided medical care during his two and one-half hour confinement in holdover. (Docket Entry No. 8, p. 2.) He

6

complains that he was forced "to use my white t-shirt to hold over my nostrils to slow the bleeding." *Id.*, p. 6.

Plaintiff seeks  compensatory damages for Jackson's use of excessive force and the denial of medical treatment.  He further claims that jail officer Captain Cook failed to supervise Jackson or conduct an internal investigation of the assault, and that Chambers County Sheriff Joe LaRive failed to supervise or discipline Jackson and Cook or launch an internal investigation into the incident.  The Court construes plaintiff's pleadings as raising claims against the defendants in their individual capacities.

Defendants move for summary judgment on the merits of plaintiff's claims against Jackson and for his failure to exhaust his claims against defendants Cook and LaRive.

## II.  SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(C).  A factual dispute will preclude a grant of summary judgment if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The trial court may not weigh the evidence or make credibility determinations.  *Id.*  Conclusional allegations, speculation, improbable inferences, or a mere scintilla of evidence, however, are

insufficient to defeat a summary judgment motion.  *See Michaels v. Avitech, Inc.*, 202 F.3d 746, 754-55 (5th Cir. 2000).

### III.   ANALYSIS

A.    <u>Claims Against LaRive and Cook</u>

Defendants LaRive and Cook argue that plaintiff's claims against them for failure to supervise or discipline should be dismissed for his failure to exhaust administrative remedies against them.  In support, these defendants assert that plaintiff did not include in his jail grievance any complaints against them for their alleged failures to supervise or discipline. The parties do not dispute that the Chambers County Jail provides a formal, written grievance procedure for use by jail inmates.  The parties agree that plaintiff filed one formal grievance regarding the instant incident.

A review of plaintiff's grievance reveals only his complaints regarding defendant Jackson; no complaints were lodged against Cook or LaRive or for  failures to supervise or discipline.   (Docket Entry No. 37, Plaintiff's Grievance.)  Accordingly, plaintiff failed to exhaust his claims against Cook and LaRive for failure to supervise or discipline, and defendants are entitled to summary judgment dismissing these claims.  *See Woodford v. Ngo*, 548 U.S. 81 (2006); *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004).

The record further shows that plaintiff failed to pursue a grievance against Cook and LaRive for their failure to initiate an internal investigation of the incident; defendants correctly argue that these claims are unexhausted.  Even assuming exhaustion, plaintiff

enjoys no constitutional right to have his complaints investigated through formal internal administrative procedures. *See Geiger v. Jowers*, 404 F.3d 371, 373-74 (5th Cir. 2005). Defendants are entitled to summary judgment dismissing plaintiff's claims for failure to investigate.

      B.    <u>Use of Excessive Force</u>

      Plaintiff asserts that Jackson's use of force against him was unprovoked and for the sole purpose of inflicting pain, sadistically and maliciously. Jackson counters that the use of force was necessary and exerted in good faith to maintain or restore discipline.

      The constitutional rights of pretrial detainees flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment. *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996). The Fifth Circuit recognizes that a pretrial detainee's excessive force claim, although technically grounded in the Fourteenth Amendment, is properly analyzed under Eighth Amendment standards. *Petta v. Rivera*, 143 F.3d 895, 912 (5th Cir. 1998). The appropriate standard focuses on "whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillan*, 503 U.S. 1, 8 (1992). This standard includes both an objective and a subjective component. Under the objective component, a court must determine whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. *Id*. at 8. Under the subjective component, the plaintiff must allege facts that show that the officer acted "maliciously and sadistically to cause

harm." *Id.* at 7.  In determining whether the use of force was wanton and unnecessary, the court considers the extent of the injury incurred, the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the official, and any efforts made to temper the severity of a forceful response.  *Id.*

It is clear from the record in the instant case that plaintiff used profanity against Jackson ("Why when you always come in here you always f**king with people?") while sitting at a table in the dayroom with other inmates (Docket Entry No. 1), and that, when Jackson entered the dayroom, plaintiff stood up and "continued to incite a disturbance by loud and defiant language," and that they "continued to exchange words."  (Docket Entries No. 37, Affidavit of Danny Jackson; No. 8, p. 9.)  The verbal confrontation quickly became physical, and the other inmates got up and surrounded plaintiff and Jackson.  Thus, plaintiff's use of profanity against Jackson precipitated a verbal altercation between the two parties that created the potential for rapidly escalating into an uncontrolled brawl in the dayroom.  From an objective standpoint, it was not unreasonable for Jackson to respond by taking action to preserve and restore order and discipline in the dayroom and bring the situation under control.  Indeed, from a subjective standpoint, those were his immediate goals given the situation:

> [Plaintiff] had a history of creating disturbances and engaging in assaultive behavior in the jail, and I believed his actions and language to be threatening and an attempt to incite the other inmates.  I was concerned for my personal safety and for the preservation of order and discipline in the jail.  I believed that, in order to defuse the situation, I needed to immediately establish some control, and to get [plaintiff] to back down.

(Docket Entry No. 37, Affidavit of Danny Jackson.)  Whether it was plaintiff or Jackson who made the first physical contact, plaintiff admits that he pushed Jackson and that they began "wrestling."  (Docket Entries No. 1, p.5; No. 8, p.9.)  Plaintiff admits that he actively fought against Jackson's attempts to bring him and the situation under control:  "Officer Jackson grabbed my clothing and struggled for control, while he attempted to throw me against the dayroom table.  I then grabbed a hold of Officer Jackson's shirt, making it difficult for him to throw me."  (Docket Entry No. 8, p. 5.)  At no point did plaintiff "stand down" or cease fighting with Jackson, and it was necessary for a second officer to be called in to help subdue plaintiff.  Only after Jackson struck plaintiff in the nose, and the two officers were able to "bring plaintiff to ground," was plaintiff finally subdued, handcuffed, and removed.

Although plaintiff maintains that it was Jackson who made the first move by "chest butting" him, and that he struck plaintiff in the nose while the second officer was attempting to restrain plaintiff, his factual disagreements raise no genuine issue of material fact precluding summary judgment.  *See Scott v. Harris*, 550 U.S. 372, 381 (2007) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.") (internal quotations and citation omitted); *see also Minter v. Great Am. Ins. Co. of New York*, 423 F.3d 460, 465 (5th Cir. 2005) ("A fact issue is material only if its resolution could affect the action's outcome.").  The record establishes that Jackson's actions were not done maliciously or sadistically for the very purpose of

11

causing plaintiff harm, but were exerted in good faith to force plaintiff to back down from a potentially dangerous situation and to restore discipline and order in the dayroom.

Plaintiff fails to present probative summary judgment evidence raising a genuine issue of material fact precluding summary judgment on his claim for use of excessive force.  No constitutional violation is shown, and defendants are entitled to summary judgment dismissing the claim.

C.    Failure to Provide Medical Care

Plaintiff complains that he was kept in a holdover cell for two and one-half hours without medical attention after the incident, even though it was "obvious to anyone" that he needed immediate medical care for his nosebleed.  As plaintiff neither alleges nor shows that he pursued a grievance regarding lack of medical care for any other incident-related injury, only his claim regarding lack of medical care for his nosebleed while in holdover is exhausted.

The parameters of plaintiff's medical care claim are unclear, as he did not raise such claim against any particular defendant in either his complaint or his more definite statement. In his complaint and grievance, plaintiff stated nothing more regarding medical care than, "I was then placed in holdover six for two and a half hours without any medical attention." (Docket Entry No. 1.)  In his more definite statement, plaintiff was ordered to identify "each and every violation of [his] constitutional rights made the basis of this lawsuit," and to identify the person who violated his rights and the act or omission constituting the violation.

In response, plaintiff listed the three individual defendants, but made no mention of a denial of medical care. (Docket Entry No. 8, pp. 1-2.) In a later paragraph requesting a description of the injuries he sustained, plaintiff reiterated his nosebleed and generically added, "The jail staff of Chambers County Sheriff's Office showed deliberate indifference to my medical needs." *Id.*, p. 2. Plaintiff also surmised in the same paragraph that, "Officer Jackson knew by the blood on the floor and on my clothing that I was in serious need of medical attention." Consequently, given a very liberal construction, plaintiff's pleadings claim that Jackson was deliberately indifferent to plaintiff's serious medical needs regarding his nosebleed while plaintiff was in holdover.

Because he was a pretrial detainee at the time, plaintiff's claims are governed by the Fourteenth Amendment. *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996). The Fourteenth Amendment requires the state to provide for the basic human needs of pretrial detainees, including the right to adequate medical care. *Id.* In order to establish a constitutional violation of this right under section 1983, a detainee must show that the jail officer acted with deliberate indifference to his serious medical needs, meaning that the officer was subjectively aware of a substantial risk of serious harm and failed to take reasonable measures to abate that risk. *Id.* at 647-48. That is, the detainee must show that the officer "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). A delay in

providing medical care is not a violation of this constitutional right unless it results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

The legal conclusion of deliberate indifference must rest on facts clearly evincing "obduracy and wantonness, not inadvertence or error in good faith." *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *see also Treen*, 759 F.2d at 1237. The failure to alleviate a significant risk that the officer should have perceived, but did not, is insufficient to show deliberate indifference. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Officers charged with deliberate indifference might show that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit soundly) that the risk to which the facts gave rise was insubstantial or nonexistent. *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

The record before this Court evinces the latter situation; that is, Jackson and the other jail officers were aware of plaintiff's nosebleed but did not consider it a serious medical injury warranting immediate medical care. In his affidavit, Jackson testified to his belief that plaintiff's nosebleed did not require medical attention:

> During the altercation, [plaintiff] got a bloody nose, but it did not appear to be a serious (sic) or something that required medical attention. I did not notice any other injuries to any other part of his body, nor did he complain to me that night, or at any other time, about any injuries. To my knowledge, [plaintiff] did not request any medical attention for his bloody nose or for any other reason, as a result of this incident.

14

(Docket Entry No. 37, Affidavit of Danny Jackson.)  This is echoed in the testimonies of

Davila and Lopez:

> On the evening of the incident, when I arrived at the scene, I noticed that
> [plaintiff's] nose had been bleeding, but it did not appear to require any
> medical attention.  He did not appear to have a broken nose or any other injury.
> After [plaintiff] had been in [holdover] for about 10 or 15 minutes, I went back
> to check on him.  I gave him some tissues to wipe his face and he did so.
> Again, I did not notice any other injuries and [plaintiff] appeared to be okay
> and did not appear to need any medical attention.  [He] did not ask to see a
> nurse or doctor, or for any other medical attention.  [Plaintiff] was returned to
> D-Tank later that night.

*Id.*, Affidavit of Gabriel Davila.

> I noticed that [plaintiff] had a bloody nose and some blood on his uniform, but
> it did not appear to me to be serious or to require any medical attention.

*Id.*, Affidavit of Claudia Lopez.  As observed by Officer Cook during his investigation of the

incident,

> In speaking with [plaintiff] and looking at the photographs taken by Cpl.
> Wilson, it also appeared to me that [plaintiff] had not sustained anything other
> than a temporary bloody nose, without any other injuries, and that [plaintiff]
> had not required or requested medical care because of the incident.  I found
> [his] claim of injury to his shoulder and knees to be suspect, because the
> photographs taken by Cpl. Wilson appeared to show only a small area on his
> knee and one on his shoulder, that appeared to be healed, with no sign of
> recent injury.  Accordingly, I closed the grievance investigation without taking
> further action.

*Id.*, Affidavit of Larry D. Cook.  According to her affidavit submitted in support of the

motion for summary judgment, Regina Ann Walker testified as follows:

> In my capacity as Medical Coordinator, I generally coordinate all medical
> activities at the Chambers County Jail.  I maintain all medical records on
> inmates.  I receive and process inmate requests for medical care.  I schedule

15

and coordinate visits of healthcare providers at the jail and transport inmates for doctor and hospital visits when off-premises medical care is required. I take blood pressures, administer tuberculosis and blood glucose monitoring tests, and oversee the administration of medications.

I am personally familiar with the medical care of [plaintiff] while he was an inmate at the Chambers County Jail and have maintained his medical records relevant to that incarceration.

*   *   *   *

When I saw [plaintiff] on September 19, [2007], I did not observe any evidence that his nose had been bleeding, or that he had suffered any other injury because of any incident that occurred on the evening of September 18, 2007. He did not say anything to me at that time about injuries received the night before, nor did he request medical care for any such injuries.

*Id.*, Affidavit of Regina Ann Walker.

Plaintiff's assertion that his nosebleed constituted an "obvious" need for immediate medical care is insufficient to meet the standards for deliberate indifference, as his conclusory allegations fail to establish that Jackson was subjectively aware that plaintiff's nosebleed constituted a serious medical need requiring immediate medical care. *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996) ("[M]ere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment."). That is, plaintiff fails to show with probative evidence that Jackson was aware that lack of medical care for the nosebleed constituted a substantial risk of harm to plaintiff, and that Jackson deliberately ignored that risk. To the contrary, the record and probative summary judgment evidence show that Jackson was aware

16

of plaintiff's nosebleed, but was of the impression that it did not warrant immediate medical attention.  No deliberate indifference is shown.

Defendant Jackson is entitled to summary judgment dismissing plaintiff's claims for failure to provide plaintiff medical care while he was in holdover.  Defendants are additionally entitled to summary judgment based on plaintiff's failure to exhaust as to any other claims he may have raised regarding deliberate indifference to his serious medical needs.

## IV.  MOTION TO STRIKE UNAUTHORIZED SURREPLY

Defendants' motion to strike plaintiff's unauthorized surreply (Docket Entry No. 62) is **GRANTED**.  The Federal Rules of Civil Procedure do not provide for the right to file a surreply in summary judgment proceedings.  FED. R. CIV. P. Rule 56.  Consequently, plaintiff was required to obtain leave of court to file a surreply.  Because plaintiff neither sought nor obtained leave to file his surreply, the surreply (Docket Entry No. 61) is not properly before the Court and is **ORDERED STRICKEN**.  Regardless, the Court has reviewed the surreply and finds that it presents no probative summary judgment evidence sufficient to raise a genuine issue of material fact precluding summary judgment in this case.

## V.  CONCLUSION

Defendants' motion for summary judgment (Docket Entry No. 37) is **GRANTED** and this lawsuit is **DISMISSED WITH PREJUDICE**.  Defendants' motion to strike the surreply

17

(Docket Entry No. 62) is **GRANTED**, and plaintiff's surreply (Docket Entry No. 61) is

**STRICKEN FROM THE RECORD**. Any and all other motions are **DENIED AS MOOT**.

The Clerk will provide a copy of this order to the parties.

Signed at Houston, Texas, on this the 9th day of February, 2010.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE